[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
Introduction and Factual Background
 A.
This case involves an appeal by United Progress, Inc. d/b/a Harbor Point Associates (hereinafter, "United Progress"), from certain decisions of the defendant Borough of Stonington Planning and Zoning Commission (hereinafter, "the Commission"), denying its applications to construct a multi-family housing complex on a five acre parcel at 32 Water Street in the Borough. United Progress utilized the affordable housing appeals legislation of General Statutes 8-30g (hereinafter referred to as "the Act"),[1] and filed three related applications: (1) an amendment to the zoning regulations to create a new zone known as a Planned Affordable Multi-Family Housing District ("PAMFHD"); (2) a request to change the zoning map from the present planned industrial zone to the PAMFHD; and (3) a request to approve a site plan to construct the project. Additionally, a coastal site plan was submitted as the entire property is located within a coastal boundary as defined in General Statutes 22a-94.
 B.
The proceedings in this case were not routine. In addition to the applicant's witnesses, the town and intervening citizens produced a considerable number of expert consultants to oppose this application. A short history is necessary to understand the Borough, the site, and the project.
1.
The Borough is a peninsula, extending into Long Island Sound, located about 10 miles easterly of New London, Connecticut. CT Page 2308 It is part of the greater Town of Stonington along with Pawcatuck and Mystic. Originally occupied by the Pequot Indians, William Cheseborough, the first English settler, built his home there in 1649. By 1774, the Borough, also known as "Long Point", was the sixth largest town in southeastern Connecticut and its citizens were engaged in the trading business, mostly for Caribbean products. Its sailors saw action in the Revolutionary War as privateers and its villagers defended a naval siege in the War of 1812. By mid-century, Stonington and New London became Connecticut's two leading whaling ports. Stonington's residents included Captain Edmund Fanning, the first American to carry the American Flag around the world in 1797-1798, Nathanial Palmer, the discoverer of the Antarctic Peninsula in 1812, and even an alleged female pirate, Ann Bonney. By 1937, the Stonington Railroad was built and the Borough was connected to Boston and New York by steamship. (Return Item 27, pp. 1-4 to 1-9).
The Borough is a historic area with all of its 454 structures on the National Register. Seventy-five (75) per cent of the structures were built before 1868. There are only 18 more buildings today than there were in 1879. (Return Items 80; 118-121). The buildings are mostly residential (Return Items 1i; 27) and the streets are narrow and designated one-way. It is a unique New England coastal village with varied architecture. The older houses date to the 1760's. (Return Item 27).[2]
2.
The site, sometimes referred to as 4.75 acres (Commission's Brief, p. 4) or just over 5 acres of (Applicant's Brief, p. 3) is on the westerly side of the Borough at 32 Water Street with approximately 600 feet frontage on Stonington Harbor. (Return Item 149). A stone breakwater extends into the harbor at the southwest corner of the site. The site is bounded by two restaurants on the north, Canon Square on the north east and Water Street, with the intersecting streets of Diving and Trumbull, to the east.
The site is now improved by old factory buildings covering 2.37 acres with approximately 180,000 square feet. They were constructed over a 100 year period beginning in 1849. (Return Item 15, p. 8). The site has been utilized by industry since that time when "John F. Trumbull built the original factory CT Page 2309 structure to produce horseshoe nails, cotton gins and steam engines." (Return Item 27). During the Civil War, the Joslyn Fire Arms Company made revolvers and breach loaders. In 1876, the Atwood Machine Company manufactured silk machines and then converted to weapons production during the second World War. After the war, Universal Winding of Cranston, Rhode Island manufactured machinery for winding and braiding wire. (Return Item 15). By 1963, Monsanto Chemical Company was occupying the property producing molds for the production of plastic bottles and employing in excess of 300 workers. (Return Item 27). In August 1987, InnoPak Corporation took over the Monsanto operation and purchased the property from Monsanto on September 1, 1987 for 4.1 million dollars. Manufacturing operations terminated in November 1990. The property is, at least at this time, still known as the "Monsanto" property.
3.
On January 20, 1989, the applicant purchased the property from InnoPak for 10 million dollars. (Return Item 104; Attachment 1 to Defendant's Motion to Dismiss). The grantee was Harbor Point Associates, a Connecticut General Partnership. In December 1990, the plaintiff herein filed an application to rezone the subject property to a "Planned Waterfront Village District" in order to develop 75 luxury condominiums and a 79 slip marina. On January 15, 1991, after a public hearing, the Commission denied the request. (Return Items 69, 140). On December 5, 1991, this three fold application was filed. (Return Item 1).
This set of applications sought an enactment of a new zone to allow 70 condominiums with a 79 slip marina. Twenty per cent or 14 units were proposed to be deed restricted to guarantee their affordability in conformance with General Statutes8-30g. Public hearings commenced on March 10, 1992 and continued to March 19, March 26, April 2, and April 7, 1992. The applications were opposed by seemingly everyone in the Borough. (Return Items 46; 50; 92). Many residents intervened in the proceedings pursuant to the Connecticut Environmental Protection Act of 1971, General Statutes 22a-16 et. seq.[3] The Commission heard dozens of nationally and even internationally known experts. On April 21, 1992, the Commission voted unanimously to deny the applications stating its reasons in several memoranda. Pursuant to General Statutes 8-30g(d), the applicant filed a modified application on May 11, 1992 attempting to CT Page 2310 respond to the Commission's reasons for denial. In the modified proposal, the applicant reduced the size of the project to 60 dwellings and 78 slips. Public hearings were held on May 27, and May 28, 1992, and on June 3, 1992, the Commission voted to deny the modification. This appeal was dated June 18, 1992.
On September 10, 1992, several Borough residents sought to intervene in this action:
A) Fifteen residents owning property within one hundred feet of the site.
B) Forty-two residents owning property in excess of one hundred feet from the site but alleging classical aggrievement.
C) Six residents filing verified petitions pursuant to General Statutes 22a-19, environmental aggrievement.
On November 20, 1992, after argument, this court granted the motions subject to an aggrievement hearing at trial. Trial was held on November 5, 1993.
 II.
Discussion
 A.
1.
The applicant alleged in paragraph one of its complaint that, "[a]t all times, plaintiff United Progress, Inc. d/b/a Harbor Point Associates, was and is the owner of real property located at 32 Water Street in the Borough of Stonington, Connecticut." On April 7, 1993, the intervening defendants moved to dismiss this action on the grounds that United Progress, Inc. was not the owner of the property during the application process as the property was owned by Harbor Point Associates. Thus the intervenors, who had not yet established their own aggrievement, were maintaining that the applicant was non aggrieved. They claimed than as Harbor Point Associates and United Progress, Inc. are two separate legal entities, United Progress, Inc. d/b/a had no standing. At the hearing on November 5, 1993, this court rejected this argument on several grounds. First, General Statutes 8-30g(b) states: CT Page 2311
 Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, . . . may appeal such decision pursuant to the procedures of this section.
The statute does not state "any owner" but rather "any person". While the statute does not define "person," its common meaning in the aggrievement/standing area of land uses cases has included any entity, natural or legal, which has the specific personal or legal interest in the property. General Statutes8-8(1); Primerica v. Planning Zoning Commission, 211 Conn. 85,94 (1989). See also, General Statutes 22a-38(2) ("[p]erson means any person, firm, partnership, association, corporation . . . ."). There is no question but that the corporation has been totally consistent throughout this administrative process, from its initial application (Return Item 1) to the appeal, in identifying who it was, who owned the property, and who was the applicant. The Commission certainly knew who had filed the application.[4] It was not United Progress, Inc. alone but rather, United Progress, Inc. d/b/a Harbor Point Associates.[5]
Initially, in January 1989, the corporation and Whitehall Properties, Ltd. were doing business as Harbor Point Associates. (Trade Name Certificate, Exhibit 4, Motion to Dismiss). Thereafter, a revised trade name certificate dated April 6, 1990, was filed with the Town Clerk indicating that United Progress, Inc. alone was doing business as Harbor Point Associates. (Exhibit 5, attached to Opposition to Motion to Dismiss). The memorandum in opposition filed by United Progress lists other examples of ownership including sewer charge and tax payments, an insurance policy allowing the Stonington Fire Department to utilize the property for training a license agreement prepared by the Borough's attorney allowing the Borough to park vehicles on the property, and a request to be made a party defendant in an unrelated lawsuit. (Exhibits 6-10, attached to Memorandum in Opposition to Motion to Dismiss). Certainly under 8-30g(d), United Progress, as the "person" whose affordable housing application was denied is aggrieved and has standing. The Commission, it should be noted, admitted that the applicant did submit the three fold application pursuant CT Page 2312 to 8-30g and that the application was denied.
To the extent traditional aggrievement rules apply, Walls v. Planning and Zoning Commission, 176 Conn. 475 (1979), this court has no trouble finding that as United Progress was the applicant, it is aggrieved by the denial. Richards v. Planning and Zoning Commission, 170 Conn. 318, 322-323 (1976); Loew v. Falsey, 144 Conn. 67, 73 (1956).
Indeed, this court can even go further and find that as the sole partner it was aggrieved, Winchester Woods Associates v. Planning and Zoning Commission, 219 Conn. 303, 307-308
(1991) or that it had all the incidents of ownership under Smith v. Planning and Zoning Board, 203 Conn. 317 (1987). Of course, an owner whose application is denied is deemed aggrieved. Bossert Corporation v. Norwalk, 157 Conn. 279, 285
1968). As noted by Professor Tondro:
 The Appellate Court has cautioned against making an `overly technical application of the test for aggrievement,' reversing a superior court's holding that the applicant was not aggrieved since he did now own the property (although his parents did); in turn, they were listed as owners but not as applicants. The parent-son relationship should not have been ignored, given the parents' consent to the use, their appearance at the hearing, and their oral characterization of all three family members as the applicants. . . The key, rather, is that here the applicant and owners have much more than an abstract interest in the property or the issue; they are all injured by the denial of their application, and this is the interest the aggrievement and standing concepts are intended to protect.
Connecticut Land Use Regulations (2nd ed.) p. 541-2 (1992).
It would be folly to suggest that United Progress is not aggrieved by this denial.[6]
2. CT Page 2313
In addition to the issue of the plaintiff's aggrievement, this court also heard testimony on the aggrievement of the intervening defendants. As noted three groups sought intervention subject to aggrievement. The first were 125 owners living within 100 feet of the property. Only Emily C. Fowler, 7 Main Street, Marion McVitty, Executrix, 4 Trumbull Street and Kathleen Channing, 45 Water Street, testified at trial. At that time this court found them aggrieved pursuant to General Statutes 8-8(1). Smith, supra 321. As the other twelve individuals did not testify, their actions were dismissed.
The second group contained 42 individuals or couples who alleged classical aggrievement; that is, than approval and construction of this project would specifically injure their properties. At the hearing, only Edward McCreary of 26 Diving Street, Robyn Dodson of 19 Wall Street and Betty Richards of 18 School Street testified. All three individuals testified that the traffic generated by the project would negatively impact their property. Ms. Richards lives southeast of 32 Water Street and Mr. McCreary lives directly east and they both would have to confront the new 217 space parking facility and its impact on Water Street. Thus, this court finds them aggrieved. Gregorio v. Zoning Board of Appeals, 155 Conn. 422, 426 (1967). Mr. McCreary was concerned not only about traffic but also about flooding. He, of course, lives on the water on the easterly side of the Borough and there was no evidence that this project would cause his property to flood. Walls v. Planning and Zoning Commission, supra, 478. Ms. Dodson lives above the project to the northeast, but due to her proximity to the parcel and the configuration of the road network, this court also finds her aggrieved. As none of the other individuals testified, their actions were dismissed.
The final group of six individuals, including Ms. Richards, intervened pursuant to General Statutes 22a-19. The section states, in relevant part:
 (a) In any administrative, licensing or other proceeding, . . . any person . . . may intervene as a party on the filing of a verified pleading asserting that the proceeding . . . involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing CT Page 2314 or destroying the public trust in the air, water or other natural resources of the state.
 (b) In any administrative, licensing or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonable likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare.
No objection was taken to the status of these individuals and all six, namely:
 1. Benson P. Blake 2. Robert Brown 3. A. Wright Palmer 4. Bartholomew Voorsanger 5. Edward Osman 6. Betty Richards
are deemed aggrieved under the statute.
At the hearing, this court limited the statutory and classically aggrieved intervenors to arguing only traditional zoning issues, as would be found in any appeal under General Statutes 8-8, as they are not independently entitled to appeal under 8-30g and set the burden switching mechanism in motion. The 22a-19 intervenors are, of course, limited to arguing only environmental issues. Mystic Marinelife Aquarium, Inc. v. Pac,175 Conn. 483, 490 (1978).
 B.
While not contested by the Commission, the intervening defendants argue that the application does not qualify as an affordable housing application and thus 8-30g does not apply. They argue that the legislative act of amending the regulations CT Page 2315 to allow the construction of affordable housing is not development as defined by the statute. In West Hartford Interfaith Coalition, Inc. v. Town Council, 228 Conn. 498, 508
1994), our Supreme Court held that "the legislature intended the statute's appeals procedure to apply to the defendant's legislative decision to grant or deny a zone change." It noted that the phrase "any application made to a Commission in connection with an affordable housing development" applied to "every type of application filed with a commission in connection with an affordable housing proposal." Id., 509. These applications clearly fall under the Act.
 C.
General Statutes 8-30g(c) states:
 (c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal is taken in a manner consistent with the evidence in the record before it.
A review of this section indicates that the legislature has now placed the burden of proof on the Commission, and not, as in traditional land use appeals, on the applicant. The Commission is required to cite reasons for its decision and the reasons are to be supported by sufficient evidence. CT Page 2316 D.
As discussed earlier, the Commission rendered its first decision on April 21, 1992. (Return Item 140). Three main reasons were cited for the denial:
 — retention of the industrial use and potential of a unique site which has supported industrial use and provided jobs and economic diversity in the Borough and for the region for more than 150 years;
 — consistency with the goals and policies of Chapter 444 of the Connecticut General Statutes ("The Coastal Management Act"), including avoidance of a substantial threat to public safety which would be created by locating high density housing in an area subject to coastal flooding and high velocity wave action;
 — maintenance of a uniquely diverse community character that acknowledges and promotes historic factors which have been formally recognized by Stonington Borough's inclusion on the National Register of Historic Places. (Return Item 140).
The applicant utilized the modification provisions of General Statutes 8-30g and submitted its second application on May 11, 1992. The modification contained certain changes to affordable housing requirements and the uses allowed in the PAMFHD. The major change was to the site plan as the plaintiff reduced the number of units from 70 to 60 with a reduction of units in the flood hazard zone from 24 to 16 units. There were also certain changes in the emergency evacuation program. Public hearings were held on May 27, and May 28, 1992, and the Commission issued its decision of denial on June 3, 1992. (Return Item 176).
At trial, the plaintiff indicated that it was appealing only the decision denying the modification and was no longer contesting the April 22, 1992 denial of the first application. This court will therefore focus on that second application. The June denial gave the same essential reasons as the CT Page 2317 April denial. The Commission identified three reasons under the heading "substantial public interests identified by Commission" (sic):
 1. Retention of industrial use and industrial potential;
 2. Consistency with the goals and policies of the Coastal Management Act;
 3. Maintenance of the diverse community character and preservation of the unique historic area.
Additionally, the Commission expressed its dissatisfaction with the proposed revisions to the PAMFHD text and the proposed site plan. Each will be addressed.
1.
The Commission's first reason was:
Retention of industrial use and industrial potential.
 The stated purpose of the PAMFHD is to "provide the opportunity to develop meaningful, dedicated, affordable housing components as a part of well planned multi-family projects" (See PAMFHD text). The applicant argues that the regulation allows affordable housing as one of many possible uses in the proposed district, and therefore the possibility of future industrial use is not ruled out. However, with the simultaneous submission of a site plan that fully develops the site for residential and marine use, the applicant has also clearly stated his intent is not to use the industrial potential which the PAMFHD provides. There is some basis for wondering whether the PAMFHD text by itself can be considered an application in connection with affordable housing, since without the site plan, there is no indication that affordable housing units would be the use selected.
 The applicant's argument that the application as submitted continue the "opportunity to implement the same non-residential principal uses as existed in the CT Page 2318 underlying Planned Industrial District" [Exhibit ) are contrary to the evidence on the record. Therefore, the substantial public interest previously identified by the Commission in retaining industrial use remains, and the modifications do not address this interest. (Testimony of Krause, Smith). (Return Item 176).
 a.
The Monsanto site is the only piece of property in the Borough that is currently zoned and available for new industrial development. (Return Item 75). The record contains a number of studies recommending the continuance of this property for industrial development. As noted by the parties, the Borough Master Plan dated January 1982, states:
 "Both the present size and diversity of the Borough tax base should be maintained, and the zoning regulations should provide for the continuation of industrial, commercial, marine and other net revenue-producing uses of land at present levels and within present commercial and industrial zone areas." (Return Item 17, p. 6).
In November 1987, Linda Krause, the Borough's planning consultant prepared a report entitled "Alternative Uses for the Former Monsanto Property Water Street." (Return Item 15). This extensive report covers the history, site characteristics, the impact of the existing use, zoning, public preferences, and potential alternatives to the existing use. She noted that there was "a general desire to retain at least some non-residential uses on the site." (Return Item 15, p. 22-23). She listed six possible uses from retention of the existing use to rezoning to a planned waterfront district to development for a commercial complex to a mixed commercial/residential or residential use. She concluded that "a change in zoning classification is not recommended at this time" (Return Item 15, p. 44), and that:
 Of all the future uses considered in this study, there are two alternatives which seem to potentially have the most positive benefit for the Borough. One is a CT Page 2319 mixed use development under the Planned Waterfront designation. The other is the creation of a new residential regulation which would allow density bonuses in exchange for public amenities. Residential density bonuses could be included in any zoning district which presently allows residential use, or could be tailored very specifically for sites such as the InnoPak property which have unique attributes that make them suitable for such consideration. (Return Item 15, p. 44-45).
A year later her report was followed by another study entitled "Committee to Study the Krause Report". (Return Item 14). The Committee was appointed by the Borough's Warden and Burgesses for the purpose of "recommending at least two alternatives for the property and making such other recommendations as necessary to identify aspects of possible future development which would be in keeping with the character of the Borough." (Return Item 14, p. 1). The Committee recommended that the Commission retain the current industrial zone. It noted, inter alia, that:
 The present industrial use is important to our diversity. In our community we regard highly diversity in our population and in the use of the land available to us. As indicated by the poll, many people feel that diversity is at the heart of our village. Future development of this or any property must seek to maintain the variety of businesses, residences and industry and make a contribution to its continuance and enhancement. Replacing some of the lost businesses, residences and industry is also desirable.
 Division of the property to serve several uses should be discouraged. We could lose the quality of diversity we are seeking.
 Local jobs are provided at the site. More than 100 jobs exist now. CT Page 2320
The Commission amended the Borough Master Plan in 1989. (Return Item 16). Among the recommendations were the statements that "proposals for new residential uses should include housing for a variety of ages, family sizes and lifestyles . . ." and
 Provision should be made for continuation of non-residential activities compatible with the surrounding residential neighborhood, provided that such uses will not be detrimental to the commercial services in the Planned Commercial District. The Planning and Zoning Commission should identify specific mixed uses which will enhance the character of the area. (Return Item 16, p. 7).
 b.
The Commission received testimony from a number of experts at the hearings. Edward J. Stockton, of Stockton Associates, testifying for the applicant, stated that "this facility is not a candidate for industrial reuse due to its extremely poor location." (Return Items 128(5); 144; 146; 148). He rebutted comments by other experts who posited that other comparable facilities have succeeded in reuse. He also indicated that unfavorable economic conditions militated against reuse and that there was little evidence to support an argument of "entrepreneurial explosion." (Return Item 128(5)). Messrs. Miner and Silverstein, appraisers, testified that the proposed development would generate higher taxes than an industrial use and that an industrial use was neither appropriate nor feasible. (Returns Items 145; 128(6)). Mr. Silverstein gave a very pessimistic outlook for the industrial reuse of the site noting, for instance, that there were over 150 industrial sites along the I-95 corridor from Old Lyme to Stonington and that 18,550 acres of land were now zoned industrial. (Return Item 144, pp. 63-74).
The Commission also received testimony from other witnesses. Dr. John Mullin, Professor of Urban Planning at the University of Massachusetts, discussed the reuse of the site stressing that it was important, for a community to determine its future use and not a developer, since "what you do there is going to be forever. What you do, once you take an industrial parcel off the zoning map, it never goes back." (Return Items CT Page 2321 77(3); 46, p. 50). He noted that while the property was most easily developed as residential, that industrial development would take time. (Return Item 146, pp. 54-55). He recommended that the Commission first adopt a strategy for reuse, and allow it to work over time before allowing a change of use. (Return Item 146, p. 58-59).
Wright Palmer, a Borough resident and real estate developer, discussed the conversions of the complex into a number of smaller uses similar to a converted New York City industrial building. (Return Items 77(2); 78; 146, pp. 42-45).
Mark Waterhouse of Garnet Consulting Services, Inc. testified in rebuttal to Edward Stockton that notwithstanding the great volume of vacant industrial space, this site is conducive to reuse for small and medium size businesses due to its attractive location. (Return Items 67; 145, pp. 67-80).
Ronald S. Jonash, director of Arthur D. Little, Inc., an economic, industrial, and regional planning consultant, testified, in part, that there was and will be:
 a sufficient demand by small to medium size businesses in Southeastern Connecticut to justify reserving this uniquely attractive site for job creating uses. The facility is comparable to other successful business incubators and multi-tenant mill buildings in the region, which serve a mix of light manufacturing, RD, and service businesses. The site has special characteristics that also make it particularly attractive, with or without the facility, to certain types of business and would provide a unique, competitive attraction for these businesses and job creating activities in the region and in the Borough."
(Return Item 145, pp. 40-41). He then discussed the economic picture of the state and this region in great detail.
 c.
The applicant has cited this court's decisions in TCR, supra, and most recently in Shapiro Farm Limited Partnership CT Page 2322 v. Planning and Zoning Commission of the Town of North Branford, CV 92-0517281S (Judicial District of Hartford/New Britain, October 15, 1993), as support for its argument that the desire to develop property as industrial does not outweigh the need for affordable housing. General Statutes 8-30g(c). Those cases, however, are distinguishable. In TCR, supra, the zoning of the parcel had not remained constant and the plan of development indicated that "this area was not well suited for industrial park development." Id., 92-93. In Shapiro, supra, the recent plan of development showed the parcel as residential and further, of 1080 acres zoned industrial and business, only 35% had been developed. Id., p. 20. This case is different as this piece is the only available industrial site in the Borough. (Return Item 27, pp. 1-29, 2-8). As noted, and as extensively discussed by the experts, the Borough has consistently and for some time expressed a desire to retain this last piece as industrial. (Return Items 14-17). Public input was obtained through a survey in the 1988 report and before this applicant was on the scene, the residents had expressed a desire to keep the site industrial.[7] Most believed the site was very important to the Borough. (Return Item 14, Appendix II).
In TCR, supra, 103, this court referred to Corthouts v. Newington, 140 Conn. 284 (1953), in which a zoning amendment that prohibited residential development in an industrial zone was held illegal. That case is inapposite to this situation due to the unique factual issues therein. Moreover, unlike than situation, the Monsanto parcel is the only piece zoned for industrial use. This Commission has not rezoned a parcel to preclude plaintiff's proposed use; rather it has been industrially used since the mid 1800's. TCR and Shapiro should not be construed to mean that the desire to retain property in an industrial use will never outweigh the need for affordable housing. Each case will be examined individually. No case is exactly the same. See, Jablon v. Town Planning and Zoning Commission,157 Conn. 434, 439 (1969).
 d.
It is true that the Borough has a need for affordable housing as defined by the Act. It has only one unit that meets the statutory definition and the Department of Housing indicates that only 3.9% of the total housing units in the whole Town of Stonington, of which the Borough is included, are deemed affordable. (Return Items 1i; 18, p. 5; 24; 140, p. 3; CT Page 2323 174; 178). There was much discussion and the Commission received a number of exhibits concerning market affordability of housing in the Borough. Betty Richards, one of the intervenors herein, with an undergraduate degree in economics and a masters degree in community planning, submitted evidence and testified that the Borough had 454 structures containing 700 dwelling units and of these, 50% or 352 were multi-family. Additionally, 47% of the dwelling units were rented and 34% of the dwelling units or 193, rented for less than $750.00 per month, within the upper limit of the affordable definition. The median rent is $565.00 per month. (Return Items 1i; 80). According to Emily Wharton, 78% of the units rent for under $749.00. (Return Item 94).
This information certainly gives a picture of the Borough but it does not mean that the Borough has satisfied its need to provide affordable housing as defined by statute. The legislature has provided a definition and it is not the market definition. West Hartford Interfaith Coalition, Inc. v. Town Council, supra, 520-521. While it may be (and has been) argued that this rule is not realistic or appropriate, it is a determination for the legislature and not this court. State v. Fiasconaro, 25 Conn. App. 643, 645 (1991).
In ruling on this zone change amendment, the Commission was acting in its legislative capacity. West Hartford Interfaith Coalition, Inc. v. Town Council, supra, 505, f. 10. It has, of course, some discretion, Parks v. Planning and Zoning Commission, 178 Conn. 657 (1979), albeit tempered by the Act. The question before this court is whether in exercising that discretion to not adopt the new regulation, or simply, to maintain the present zone, the Commission based its decision on sufficient evidence that clearly outweighs the need for this affordable housing proposal. Under these circumstances, based on the evidence before it, the Commission's desire to retain the industrial use,[8] or at least not adopt this specific proposal, together with the additional reasons that will be discussed hereinafter, constitutes a substantial public interest in health, safety, or other matters which outweigh the need for this affordable housing proposal. General Statutes 8-30g(c).
2.
a. CT Page 2324
The second reason offered in support of the denial was:
 2. Consistency with the Goals and Policies of the Coastal Management Act
 Testimony of Hart and letters from Rocque (Exhibit 6K) and Callahan (Exhibit ) provide evidence that a substantial public interest remains in alleviating the increased danger to public health and safety due to development within the coastal flood hazard area. Rocque's letter (Exhibit 6K) states that the revised applications have not adequately addressed all outstanding concerns raised previously, "especially with respect to coastal flood hazards and the level of public access amenities allowed by the PAMFHD." The Rocque letter further states that it is the applicant's burden under 22a-106(c) of the Connecticut Coastal Management Act to demonstrate that adverse impacts of the proposed activity are acceptable and consistent with the goals and policies of 22a-92 of the Coastal Management Act. "Without an acceptable rationale justifying the elimination of only one-third of the residential units from the V-zone or a demonstrable lack of reasonable alternatives to residential development in coastal high hazard area, the burden has not been met, and accordingly, the modified coastal site plan is inconsistent with the coastal flood hazard policies and standards of the CCMA" (Exhibit 6K, p. 3). While modifications reduce the risk to life and property, the risk remains at an unacceptably high level.
The parcel is located entirely within the coastal boundary, in the "V-10" and "A-8" flood zones.[9] The V-zone cuts a swath through the parcel in the shape of a horseshoe,[10]
encompassing 24 units in the December 9, 1991 application and 16 units in the modified application of May 11, 1992.[11]
CT Page 2325 1.
The Connecticut Coastal Management Act (CCMA), General Statutes 22a-90 to 22a-112 inclusive, mandates the procedures which must be followed when development is proposed within the coastal boundary. Before addressing the procedures however, it is instructive to review the legislative goals and policies of this act. Included among the policies of 22a-92
are:
 (1) To insure that the development, preservation or use of the land and water resources of the coastal area proceeds in a manner consistent with the capability of the land and water resources to support development, preservation or use without significantly disrupting either the natural environment or sound economic growth;
 (2) To preserve and enhance coastal resources in accordance with the policies established by chapters 439, 440, 446i, 446k, 447, 474 and 477;
 (3) To give high priority and preference to uses and facilities which are dependent upon proximity to the water or the shorelands immediately adjacent to marine and tidal waters;
 (4) To resolve conflicts between competing uses on the shorelands adjacent to marine and tidal waters by giving preference to uses that minimize adverse impacts on natural coastal resources while providing long term and stable economic benefits;
 (5) To consider in the planning process the potential impact of coastal flooding and erosion patterns on coastal development so as to minimize damage to and destruction of life and property and reduce the necessity of public expenditure to protect future development from such hazards; CT Page 2326
 (6) To encourage public access to the waters of Long Island Sound by expansion, development and effective utilization of state-owned recreational facilities within the coastal area that are consistent with sound resource conservation procedures and constitutionally protected rights of private property owners; . . .
 (9) To coordinate planning and regulatory activities of public agencies at all levels of government to insure maximum protection of coastal resources while minimizing conflicts and disruption of economic development; and . . . .
Additionally, 22a-92(b) includes policies for administrative agencies and 22a-92(b)(2)(F) states:
 [T]o manage coastal hazard areas so as to insure that development proceeds in such a manner that hazards to life and property are minimized and to promote nonstructural solutions to flood and erosion problems except in those instances where structural alternatives prove unavoidable and necessary to protect existing inhabited structures, infrastructure facilities or water dependent uses.
The legislature has defined "adverse impacts on coastal resources" in 22a-93(15). Certain sections are relevant to this case:
 (15) (A) Degrading water quality through the significant introduction into either coastal waters or ground-water supplies of suspended solids, nutrients, toxics, heavy metals or pathogens, or through the significant alteration of temperature, pH, dissolved oxygen or salinity; (B) degrading existing circulation patterns of coastal waters through the significant patterns of tidal exchange or flushing rates, freshwater input, or existing basin characteristics and channel contours; . . . (E) increasing the hazard of coastal flooding through significant alteration CT Page 2327 of shoreline configurations or bathymetry, particularly within high velocity flood zones; (F) degrading visual quality through significant alteration of the natural features of vistas and view points; (G) degrading or destroying essential wildlife fin-fish or shellfish habitat through significant alteration of the composition, migration patterns, distribution, breeding or other population characteristics of the natural species or significant alteration of the natural components of the habitat . . . .
2.
Turning to the procedures of the CCMA, General Statutes22a-104(e) mandates consistency between zone changes within the coastal boundary and the CCMA.[12] General Statutes22a-105 requires coastal site plan review and a final decision by the zoning commission before any activity can take place within the coastal boundary. General Statutes 22a-106(c) requires that an applicant for coastal site plan approval "demonstrate [to the commission] that the adverse impacts of the proposed activity are acceptable and shall demonstrate that such activity is consistent with the goals and policies of 22a-92." Zoning commissions must submit any such proposed zone change to the Commissioner of the Department of Environmental Protection for review. The Commissioner may comment on such changes and zoning commission shall consider those comments. Finally, General Statutes 22a-109(a) states, in part, that "[r]eview of a coastal site plan under the requirements of this section shall supersede any review required by the municipality under subsection (g) of section 8-3 and shall be in addition to any applicable zoning regulations of any special district exercising zoning authority under special act." Therefore, the goals, policies, and adverse impacts defined by our legislature must be considered by a zoning commission when reviewing a coastal site plan, regardless of other provisions within the municipal zoning ordinance.
 b.
As noted, this court is primarily concerned with the modified application. The applicant filed its only request for coastal site plan review with the initial filing in December 1991. (Return Item 1f). It did not resubmit a new application with the May 11, 1992 request. While the Commission has argued CT Page 2328 that the plaintiff has waived its right to appeal a denial of this application since it did not appeal pursuant to General Statutes 8-8, this court refuses to adopt that reasoning. Just as our Supreme Court noted in Vartuli v. Sotire, 192 Conn. 353,358 (1984) that "the [coastal management] act envisages a single review process, during which proposals for development within the coastal boundary will simultaneously be reviewed for compliance with local zoning requirements and for consistency with the policies of planned coastal management", the review of an affordable housing application also anticipates a consolidated process. The allowance of the modified application pursuant to General Statutes 8-30g(a) stays the period for filing an appeal on the first application. At the commencement of the second set of hearings, the Commission through its Chairperson, noted that, "the information submitted here is considered part and parcel of the original applications . . . and therefore, all the information in the original Public Hearing is still under consideration." (Return Item 180, p. 13). This court thus concludes that the issues concerning the denial of the coastal site plan are such an inherent part of this affordable housing application that they are properly included in this appeal.
 c.
Pursuant to General Statutes 22a-104(4), the Commission submitted the proposed zoning amendment to the Commissioner of Environmental Protection[13] for a determination of consistency with the policies of the CCMA. In his March 19, 1992 letter to the Commission, DEP Assistant Commissioner Rocque found that the applications were inconsistent with the CCMA:
 Approval of any zone change which permits intensive residential development on the site will increase the potential for hazards to life and property. One significant concern with residential development in coastal flood hazard areas results from the general difficulty to persuade residents to evacuate their homes and leave their personal property during major coastal storms. Individuals are generally more willing to evacuate their workplaces and commercial facilities which they do not own and which do not house their personal property. Further, CT Page 2329 experience also suggests that when residents do evacuate their homes, it is likely to be at the last possible moment before the storm hits which can clog evacuation routes at the worst times. Finally, public safety may also be jeopardized in the event that emergency vehicles must enter flood hazard areas simultaneously with evacuation efforts. Therefore, it is imperative that the design of any residential development on the subject site ultimately incorporates all measures necessary to ensure the safety of all future residents and structures and lessen flood hazard potential. This can be accomplished most effectively by restricting the number of additional residential units in floodprone areas and by locating them on the safest portions of floodprone sites. The coastal site plan indicates that a significant number of residential units would be located within the high hazard V-zone on the site. It is inconsistent with CCMA coastal hazard area policies and standards to site residental [residential] structures in V-zones if feasible alternatives exist. (Return Item 61).
The initial applications were denied on April 21, 1992. (Return Item 140). In compliance with 22a-104, the May 11, 1992 modified application was also submitted to DEP/OLISP, and once again, DEP/OLISP determined that it was inconsistent with CCMA. In a May 28, 1992 letter to the Commission, Assistant Commissioner Rocque commented:
 [T]he application text indicates than the number of units located in the V-zone has been reduced from 24 units to 16 units. While the applicant's attempt to minimize potential hazards is commendable, the 16 residential units remaining in the V-zone, as well as all occupants and their property, would be at the same high degree of risk as that associated with the 8 units which were eliminated. The applicant has not attempted, in the coastal site plan CT Page 2330 application, to demonstrate that this 33 percent reduction in units within the V-zone renders the project consistent with the coastal flood hazard policies and standards of the CCMA. No discussion of the rationale justifying the applicant's decision to eliminate only 8 residential units from the V-zone, all from one building, has been provided.
 Pursuant to 22a-106(c) of the CCMA, it is the applicant's burden to demonstrate to the commission's satisfaction that the adverse impacts of any proposed activity are acceptable, and that the activity is consistent with the goals and policies contained in 22a-92 of the CCMA. . . Without an acceptable rationale justifying the elimination of only one-third of the residential units from the V-zone or a demonstrable lack of feasible alternatives to residential development in coastal high hazard areas, the burden has not been met, and accordingly, the modified coastal site plan is inconsistent with the coastal flood hazard policies and standards of the CCMA.
 In light of this inconsistency, we continue to strongly recommend that all residential units be eliminated from the V-zone unless the applicant can demonstrate to the commission's satisfaction that feasible alternatives to locating residential units within the V-zone do not exist, and that all potential flood hazard impacts have been minimized to the maximum extent practicable. (Return Item 170).
In its June 3, 1992 denial of the plaintiff's modified application, the Commission essentially adopted the findings set forth by Assistant Commissioner Rocque.
 d.
It was not improper for the Commission to consider CT Page 2331 the findings of the DEP in its decision to deny the application. As noted, General Statutes 22a-104(e) requires the Commission to give DEP notice of the proposed zone change, allows the DEP to comment, and requires the Commission to consider chose comments. Furthermore, the Commission consists of lay people and can rely on the assistance of experts. See generally Yurdin v. Town Plan and Zoning Commission, 145 Conn. 416,421 (1958) cert. denied 348 U.S. 894 and its progeny. See also Von Saal v. Stratford, CV 91-279021, Judicial District of Fairfield at Bridgeport December 30, 1991, McGrath, J., (Commission denied plaintiff's coastal site plan application based on the DEP's recommendation.)
Rocque's testimony concerning the safety of V zone construction and the presence of feasible alternatives was rebutted by the applicant's consultants, Lester B. Smith, Jr. of Daylor Consulting Group, Inc. (Return Item 128, p. 3) and Alan Beveridge, AIA of Yamashita and Associates, Inc. (Return Item 128, p. 10). However, the Commission was free to conclude as it did that V zone residential construction was inconsistent with CCMA coastal hazard area policies. It is entitled to make its choice of which expert to believe or not believe. Manor Development Corporation v. Conservation Commission, 180 Conn. 692,697 (1980).
Much of the testimony concerned the difficulties of evacuation and the resulting hazards to life and property. The concern was especially great due to the characteristics of this peninsula. However, in addition to the testimony on the evacuation problems and safety hazards resulting from the placement of 16 units in the V-zone, the Commission also received testimony of other adverse impacts or problems. For instance, there was testimony concerning pollution problems caused by the impact of flooding on cars stored in the 217 space below grade parking garage. (Return Items 57; 70; 145). There were also several concerns about the impact of the 78 slip marina, including but not limited to, (1) the impact on the shellfish population; (2) the lack of approval from the Harbor Management Commission;[14] (3) the lack of support facilities; and (4) the interference with open water areas affecting both mooring expansion and navigability. (Return Items 57; 70). While the marina would obviously give public access to Long Island Sound, little effort was made to rebut the comments and concerns raised at the hearing. (Return Item 180, p. 25). Indeed, Mary Beth Hart, testifying for OLISP indicated that while her unit CT Page 2332 had no authority over the marina, that a permit was still needed from DEP, pursuant to General Statutes 22a-361 and that no application was on file. (Return Item 145).[15] Michael Klein, principal of Environmental Planning Services, testifying on behalf of the Intervenors, also found difficulties with the erosion and sediment control plan and existing soil contamination on the site. (Return Item 145). The Commission's decision was therefore supported by sufficient evidence on the record.[16] General Statutes 8-30g(c).
 e.
The applicant further argues and in fact, the Commission concedes, that there is no federal, state, or municipal prohibition against residential construction within a V-zone. While this may be true, it still would not alter the fact that the Commission must consider the goals, policies, and adverse impacts defined in the CCMA when it reviews a coastal site plan and makes its decision. Flood hazards and the associated dangers are specified throughout the CCMA. (22a-92(5),22a-92(b)(2)(F), 22a-93(1)(E)) and must be considered in order to determine whether or not a site plan is consistent with the CCMA. Certainly the potential dangers to life and property must be recognized as an adverse impact of siting residential development in a severe flood hazard zone, the V zone. Connecticut has clearly recognized the validity of land use restrictions to control flood hazards. Vartelas v. Water Resources Commission, 146 Conn. 650 (1959). Indeed, regulation may in many instances result in prohibition. Shorehaven Golf Club, Inc. v. Water Resources Commission, 146 Conn. 619, 625
(1959).
This court is not ruling that all residental [residential] V zone construction should be prohibited.[17] Rather, the Commission must analyze each situation on a case by case basis. In this sense, it is not unlike the analysis which is performed by an inland wetlands agency in determining the impact of a significant activity. While there is no outright ban on filling wetlands, they too, like coastal resources, are recognized by our legislature as worthy of protection. General Statutes 22a-36
et. seq. The agency must look to the legislative purpose in carrying out its authority. Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 551 (1987).
Additionally, the applicant claims that the Commission, CT Page 2333 without notice or hearing, has promulgated a new standard, the feasible and prudent alternative standard, which is lacking in the CCMA but which of course is found in CEPA, General Statutes 22a-19 and the Inland Wetlands and Watercourses General Statutes 22a-41. See, for example, Hoffman v. Inland Wetlands Commission, 28 Conn. App. 262, 264-265 (1992) cert. denied, 223 Conn. 925. While the exact words do not appear in the CCMA, such a literal reading is not required. As noted, General Statutes 22a-92(b)(2)(F) sets forth the goal and policy that the state and its political subdivisions must "manage coastal hazard areas so as to insure that development proceeds in such a manner that hazards to life and property are minimized and to promote nonstructural solutions to flood and erosion problems except in those instances where structural alternatives prove unavoidable and necessary to protect existing inhabited structures, infrastructure facilities or water dependent uses." The need to minimize hazards to life and property thus includes the need to evaluate feasible alternatives to a proposed development. Simply put, the question is whether there might be an alternative to the proposed site plan. The Commission did not act improperly in its search for feasible alternatives to these applications as proposed.[18] Moreover as noted, since the 22a-19 petitions had been filed, the Commission had a duty to consider whether there was a feasible and prudent alternative to this proposal. General Statutes22a-19(b); Manchester Environmental Coalition v. Stockton,184 Conn. 51, 61-63 (1981).
This court cannot say that the Commission's decision to deny the application based on the finding of inconsistency with the Coastal Management program was not supported by sufficient evidence that clearly outweighs the need for this affordable housing proposal. General Statutes 8-30g(c).
3.
The third reason offered in support of the denial was:
 3. Maintenance of the diverse community character and preservation of the unique historic area.
 The May 11th modification letter proposed a reduction in the maximum allowable residential CT Page 2334 density for the PAMFHD, but the May 28th modification letter stated that this was an error and that the maximum density in the zoning text remains unchanged. Instead, the applicant proposes a reduction in the number of units shown on the site plan to bring the site plan into conformance with his own original text proposal. The applicant's present proposal for calculation of residential density is confusing, and does not appear to clearly differentiate acreage designated for residential use from acreage designated for other uses. In any event the density standard remains at an unacceptable level and is inconsistent with Borough density standards. (Testimony of Krause, Knox, previous exhibits.)
 The applicant has not addressed Commission concerns about excessive height, obstruction of required viewlanes, and excessive building size, which have a substantial adverse impact on the historic architectural character and scale of the Borough. (Testimony of Krause, Know, previous exhibits.)
The record contains documents referring to the diverse community character (Return Item 80) and the issue was touched upon at argument. Nevertheless, the town did not brief this specific issue and this court treats this part of the reason as abandoned. Liscio v. Liscio, 204 Conn. 502, 507
(1987); Gerrety Co. v. Palmieri, 11 Conn. App. 226, 232 (1987).
The Commission did address the second half of the reason, the preservation of the unique historic area. A review of the text under this reason indicates that the Commission was concerned about the affect of development under the proposed amendments on the existing density, height, waterviews and historic architectural character of the Borough. (Return Item 176).
As previously noted, all structures on the Monsanto site are listed on the National Register of Historic Places. (Return Items 80; 118-121). While all of the site's buildings would be demolished, with the exception of the stone machine CT Page 2335 building built by John Trumbull from 1849-51 (Return Items 27; 131; 149), the issue is not the preservation of these buildings. Rather, the issue is the impact of the new buildings on the Borough.
 a.
In the 1990 application, the plaintiff sought to construct "approximately 75 upper market condominiums." (Return Item 140). This was reduced to 70 units in this application and further reduced to 60 units in the modified application. (Return Items 149; 176). The present residential zoning regulations allow 8 units per acre. (Return Item 13).
The exact density of the lower Borough is not clear. The applicant maintains that it is 15.9 units per acre (Return Item 128; Plaintiff's Brief, p. 49) while others testified that it was lower, at 10.89 units per acre. (Return Item 91). There is also a question of what density is actually proposed by the plaintiff. While it maintains that the density is 12 units per acre, if the property that is dedicated to the 78 slip marina use is subtracted, the density goes up (Return Item 13; 12.6: 500 square feet for each slip) as the size of the property is reduced by about 1 acre.
The Commission was concerned with the applicant's inability to explain the actual density in terms of the varied use of the parcel. Indeed, the applicant even attempted to change the formula of the modified application at the very close of the public hearing. (Return Item 172). The Commission ultimately stated "[i]n any event the density standard remains at an unacceptable level, and is inconsistent with Borough density standards." (Return Item 176). The density issue was, as previously discussed, translated, in part, into a safety issue due to the coastal flooding and high velocity wave action. (Return Item 140). Clearly, that is a legitimate focus for the Commission. General Statutes 8-30g(c)(2); 8-2. See generally, Vartelas v. Water Resources Commission, supra, 657. To the extent the Commission was concerned about the units in the V Flood zone, the denial based on density is not unlawful. It is supported by sufficient evidence in the record.[19]
b. CT Page 2336
The next sub-part of the impact issue concerns the height of the proposed buildings. The zoning regulations applicable to the site now allow a maximum building height of 30 feet. (Return Item 13, 11.3). It is measured from existing grade. The applicant has proposed a new height of 42 feet — not from existing grade, but rather from the federal flood plan regulation of 9 feet above sea level or 51 feet from grade. (Return Items 91; 97; 128).
The Commission's planner, Linda Krause, stated, in part, at the first set of hearings that:
 The proposed maximum building height of 42 feet above the FEMA 100 year V-zone flood elevation is excessive, in conflict with the height requirements elsewhere in the Borough, and inconsistent with the need to preserve the unique historic and architectural resource recognized by inclusion of the village on the National Register of Historic Places. One of the most important factors in determining whether a new structure is in keeping with the surroundings is its height. Thirty feet was chosen as the Borough standard to maintain a streetscape which is compatible with the historic building pattern, and which allows some "stepping down" of buildings located on lower ground closer to the water. The Borough finds that excessively tall buildings along the water do not fit the historic development pattern, and obstruct existing views that tie the village to the water in an important way. The Borough provides for an increase in height about (sic) the current 30 foot limit, for certain mechanical and architectural features.
 Properties located in a V-zone must have residential construction elevated about (sic) the base flood elevation due to danger from wave action. This means that the Flood Hazard area has more limited development potential than other areas. The applicant has not only ignored this limitation, CT Page 2337 but actually used it as a basis for allowing greater development than in other less hazardous locations. The applicant has proposed NOT 30 feet above FEMA, to maintain a building potential equal to less hazardous areas in the Borough, but 42 feet above FEMA, which would allow a greater development potential in the V-zone than elsewhere in the Borough.
Howard Knox, a local architect, testified that the existing 30 foot level applied in all zones and that "no special heights should be granted for just one zone nor should one zone be measured from FEMA heights and others from grade." (Return Item 91, p. 1). The Monsanto property now contains buildings which are 41 to 43 feet above the FEMA level. The applicant proposed the 42 foot height because it "is approximately the maximum height of the existing factory buildings." (Return Item 128, 7). Mr. Knox noted that:
 At present, the existing four-story structures on this site represent only 5 percent of the site area. The historical stone structure is only 2 percent of the site area. The proposed amendment would allow ten times this amount of four-story structure.
The Southeastern Connecticut Regional Planning Agency also commented in connection with its 8-3b review that "building height limits of 42 feet above FEMA level appeared excessive." (Return Item 49). The Agency did, however, find the proposed concept consistent with the Regional Plan of Development.
In denying the application, the Commission found the proposed height to be excessive. (Return Item 176). In most cases, the building height, if not totally unreasonable, would not normally constitute a substantial public interest in health safety or other matters which the Commission could legally consider that would outweigh the need for the affordable housing. This is not the normal case. The Borough is a historic place of great importance. As noted by the applicant:
 Few communities in the northeastern United States can compete with Stonington with respect to historic architecture. The Borough's CT Page 2338 houses, churches, institutional and commercial buildings are of exceptional merit, both because their original design quality is so high, and because the majority is so well preserved. Today, Stonington retains the ambience of an ultimately scaled 19th century village. (Return Item 27, pp. 1-10).
In its most interesting submittal, "Stonington, A Background for Development," the applicant describes the architecture of the Borough with examples of pre-revolutionary (pre-1780), Georgian (1760-1800), Federal (1775-1830), Transitional Federal/Greek Revival (1820-1840), Greek Revival (1820-1845), Transitional Greek Revival/Italianate (1840's), Italianate (1840-1855), Gothic Revival (1845-1870), Mansard/French Second Empire (1860-1880), Queen Anne (1880-1910) and Shingle Style (1885-1910) architecture. (Return Item 27, pp. 1-20-21). The record contains photographs of many of the buildings in the Borough. (Return Item 82). Under traditional zoning, our legislature has acknowledged that zoning regulations,
 "[s]hall be made with reasonable consideration as to the character of the district and its peculiar suitability for particular uses."
Additionally, "[z]oning regulations may be made with reasonable consideration for the protection of historic factors . . . ." General Statutes 8-2. In Chapter 97a of our statutes, the legislature has further provided for the creation of historic districts and historic properties. General Statutes 7-147a
et. seq.; see generally, Gentry v. Norwalk, 196 Conn. 596, 607
(1985); Figarsky v. Historic District Commission, 171 Conn. 198,208 (1976). Recently our Supreme Court concluded that public health and safety includes the protection of the environment which in turn, includes historic preservation. Thus, it held that a Commission could promulgate subdivision regulations which take into account historic factors. Smith v. Zoning Board of Appeals, 227 Conn. 71 (1993). While this applicant filed its modified application addressing the height issue in part with some change to Buildings 5 and 7, it did not address the total issue to the satisfaction of the Commission. (Return Items 149; 176). CT Page 2339 c.
Another issue is the impact of the proposal on specific views and the Borough's vista protection regulations. (Return Item 14). In attempting to design an attractive complex, the developer sought to park the cars somewhat underground. This in turn created new vista obstructions. Additionally, while creating new views (Trumbull Street) and opening up the waterfront to the public with essentially a ten foot walkway (Return Item 128), other vistas will be obstructed (31 Water Street). (Return Items 101, 102). Existing buildings now obstructing views would be torn down but the placement of new buildings would change existing views. There is perhaps no easy resolution.
 d.
This is surely a complex site — from tidal and flooding problems to traffic issues to historic issues, etc. Indeed, as noted by Judge Fuller in his commentary on the Act, "[i]n many situations the site itself may have topographic or similar problems which prevent changes in the project without either making the project economically impractical or adversely affecting the public interest." Land Use Law and Practice, 51.5 (1993). An additional factor in this case is the cost of developing the parcel. The record contains several suggestions that the purchase price was simply too high and that this is really a luxury condominium project with a marina for large boats. It has been estimated that this project could cost as much as 36 million dollars before interest. (Return Item 77, 4). The project does contain the minimum number of affordable units and thus falls under the purview of the Act even if the remaining units are projected to sell from $300,000.00 to $625,000.00. (Return Items 77, 4; 80). Indeed, the purchase price of a slip has been estimated at $60,000.00 (Return Item 77, 4), a little less than one-half the cost of an affordable unit. This court need not determine whether this is really a wolf in sheep's clothing. Rather, it finds that the Commission properly met its burden on reason three. The applicant should consider a different application as there is sufficient evidence to uphold this decision. These reasons are not specious or pretextual. This court is not holding that historic factors, height limitations, density issues, or scenic vistas individually outweigh the need for affordable housing. Rather, it is the combination of all these factors and the physical CT Page 2340 characteristics of the Borough and this site which control this case.
4.
In addition to the above issues, the Commission also expressed its dissatisfaction with the text of the proposed regulation. (Return Item 176). Specifically, the Commission believed the statement of purpose (12b.1), permitted uses (12b.2), bulk requirements (12b.3), combinations of uses (12b.3.1), environmental protection (12b.6) enforcement and filing (12b.9.1), and the affordable housing provisions (12b.10.1) were not appropriate. For instance, the Commission found that "[e]fforts to address the calculation of maximum residential density have not eliminated the substantial ambiguity of the text" (12b.3). Additionally, the Commission commented, as it had in the original denial, that the proposed regulation did not include specific standards for the other uses allowed in the PAMFHD zone. The Commission was, of course, not only concerned with the specific development proposal, but also with reviewing the affects of possible development that could be built if the regulation were adopted. See, Beit Havurah v. Zoning Board of Appeals, 177 Conn. 440, 443
(1979). Thus, this case is similar to D'Amato v. Orange Planning and Zoning Commission, CV 92-0506426S (Judicial District of Hartford/New Britain, February 5, 1993), and Indian River Associates v. North Branford planning and Zoning Commission, 6 Conn. L. Rptr. No. 13, 372, in which this court sustained the administrative decisions because of drafting problems. Vague regulations containing meaningless standards leading to ambiguous interpretations are impermissible. Barberino Realty 
Development Corp. v. Planning and Zoning Commission, 222 Conn. 607,618-619 (1992). The Commission's concern was proper.
 D.
To the extent six individuals have intervened in this case pursuant to General Statutes 22a-19, this court must also address the issue of whether the Commission has fulfilled its statutory duty under that section. As noted, that section prohibits an administrative agency from approving any conduct which "has, or is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state." Inasmuch as the second reason of denial was based on the proposal's CT Page 2341 incompatibility with the coastal zone management program, including not only the safety issue, but the possible problems, arising from the parking garage and the marina (Return Items 1f; 140), it was warranted. Additionally, as earlier noted, this statute also applies to historic structures and all structures on this property are listed on the National Register of Historic Places. General Statutes 22a-19a; Smith, supra, 86.
 E.
In Builders Service Corp. v. East Haddam, 208 Conn. 267,298 (1988) (minimum floor area requirements in a zoning regulation deemed invalid in the absence of evidence demonstrating a rational relationship between the floor requirements and legitimate objectives of zoning) our Supreme Court commented on the use of zoning regulations to discriminate against persons with moderate or lower incomes. The applicant alleges that the denial herein constitutes such economic discrimination. While the court is obviously aware of such a possibility, it does not believe, for the reasons stated in this opinion, that this denial constitutes that prohibited practice. Additionally, this court disagrees with the applicant that the denial is not based on terrain or infrastructure reasons. General Statutes 8-2. In TCR, supra, 101, this court discussed the federal test to determine whether local municipal actions were discriminatory. This court refers to that discussion and notes that these denials satisfy the tests set forth in Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926
(2d Cir. 1988), aff'd. 488 U.S. 15, reh. den., 488 U.S. 1023
(1988).
 III.
Conclusion
An action of a commission should be sustained if even one of the reasons is sufficient to support it. Goldberg v. Zoning Commission, 173 Conn. 23, 26 (1977). As the Commission has sustained its burden of proof, the appeal is dismissed.
MARSHALL K. BERGER, JR. JUDGE, SUPERIOR COURT